# CHICAGO, ROCK ISLAND AND PACIFIC RAILROAD CO. *v.* ARKANSAS COMMERCE COMMISSION

5-4381                                              420 S. W. 2d 917

Opinion delivered December 4, 1967

[Rehearing denied December 18, 1967.]

*Wright, Lindsey & Jennings,* for appellant.

*Edward H. Boyett,* for appellee.

JOHN A. FOGLEMAN, Justice. Appellant asks that we reverse the trial court's judgment affirming the action of the Arkansas Commerce Commission denying to it authority to discontinue the operation of its agency station at Mansfield.

Notice of discontinuance by the railroad company was filed September 26, 1966. The governing statute in such cases is Act 203 of 1961, appearing as Ark. Stat. Ann. § 73-809 (Supp. 1967), which in pertinent part reads:

"b. Any railroad operating in this State may file with the Arkansas Commerce Commission a notice of discontinuance, * * * of any of its agency stations together with a statement certified by a proper officer of the railroad to the effect that such agency station had been operating at a financial loss according to standard accounting procedures for not less than one [1] year immediately preceding, or that operating economies would result *consistent with public convenience and necessity;* and such agency station may thereupon be closed or modified ninety [90] days after date of filing of such notice unless a petition for the re-establishment of such discontinued, * * * agency station, signed by at least twenty-five [25] qualified electors residing in the city, town or political subdivision where the same is located, is filed with the Arkansas Commerce Commission within sixty [60] days after date of filing of the notice aforesaid. The Arkansas Commerce Commission is authorized, empowered and required to hear and consider all petitions for the re-establishment of any agency station discontinued, * * * by the railroad under authority of this Act [section], which hearing shall be held within sixty [60] days following filing of petition for re-establishment and following thirty [30] days written notice of such hearing to the railroad and petitioners. In determining whether an agency station should be discontinued, * * * the standard to be employed is whether the railroad has operated the agency station at a financial loss according to standard accounting procedures for not less than one [1] year immediately preceding the filing of the notice of discontinuance, * * * or whether operating

economies would result therefrom." [Emphasis ours]

Sufficient petitions protesting the discontinuance were filed. A hearing was held on October 26, 1966. The order of the Commerce Commission was dated January 17, 1967. The Commission found that appellant had not met its burden of proof and made the following findings:

1. The continued maintenance of an agency station at Mansfield, Arkansas, is required by the public convenience and necessity; that the facilities of the Chicago, Rock Island & Pacific Railroad Company would be inadequate to meet public necessity in the event the station at Mansfield be ordered closed.

2. Operating economies consistent with the public convenience and necessity as provided by Act 203 of the Acts of the Arkansas General Assembly of 1961 will not result from the discontinuance of the agency station at Mansfield, Arkansas.

3. Discontinuance of the agency station at Mansfield, Arkansas, should not be granted at this time. IT IS THEREFORE ORDERED, that the authority to discontinue the operation of an agency station at Mansfield, Arkansas, by the Chicago, Rock Island & Pacific Railroad Company be, and the same is hereby, DENIED.

The scope and extent of our review is outlined in *Fisher* v. *Branscum*, 243 Ark. 516, 420 S. W. 2d 882. Under the rules therein set out, we must determine whether the judgment of the circuit court is clearly against the preponderance of the evidence. In doing so, we accord due deference to the Commission's findings because of its peculiar competence to pass upon the fact questions involved and because of its advantage in seeing and hearing the witnesses. We also keep in mind that the burden is on the appellant to show that the judgment is erroneous.

Appellant's case as to financial loss must fail for two reasons. First, there is no evidence to show whether there was financial loss for one year immediately preceding the notice of discontinuance, i. e., from September 27, 1965 to September 26, 1966. Secondly, there is nothing to show that the accounting procedures used in this case are "standard accounting procedures" in the sense of the Act.

In seeking to show financial loss, appellant offered an exhibit entitled "Chicago, Rock Island. and Pacific Railroad Company Statement Showing Revenues and Expenses Assigned to Station at Mansfield, Arkansas, For the Twelve Months Ending June 30, 1966, Including Operating Expenses Charged to Station Based on Cost of System Operation for the Year 1965." It was prepared by Joseph Hyzny as the Chief Cost Research Analyst. This exhibit showed a loss of $6,214.95 for the operation of the Mansfield station. In order to arrive at this figure, the railroad accountants assigned to the station one-half of all revenues from freight forwarded to or received from all other points on the Rock Island lines, all revenues for freight forwarded or received from points on other lines, all passenger revenue receipts, 40% of express receipts and certain miscellaneous revenues. They then deducted certain operating expenses. The total station expenses amounted to $8,028.66, leaving a net station profit of $6.515.93. All these revenues and expenses were for a twelve-month period ending June 30, 1966. The alleged loss figures were obtained by determining the percentage ratio of expenses (other than station) to revenue over the entire system for the year 1965 and allocating this same ratio to the total revenues at Mansfield. By this process, $12.730.88 in indirect expenses were added to the direct expense. Other such computations showed similar losses for the years 1964 and 1965. No explanation is offered as to the reason for allocating only 40% of the express revenues to Mansfield. No receipts or revenues for handling mail are accounted for, although W. C. DeVries, appel-

lant's Superintendent of Station Service, offered an exhibit showing the method of handling United States mail off the passenger trains there and testified that the agent worked the mail. Among the items of indirect expenses allocated over the system were costs of maintaining the rails and right-of-way, the cost of the engineer, conductor, brakeman, fireman, cost of maintaining the locomotives, the cost of salaries, accounting, cost of rate clerks, and attorneys' fees.

There was no evidence of the amount of revenues received for the period between June 30, 1966, and the date of the notice of discontinuance, a period of approximately three months. No system expenses or expense/revenue ratio for twelve months preceding the date of the notice was shown. Clearly, appellant failed to make any showing of financial loss for a period of twelve months *immediately* preceding the filing of the notice. Mr. Hyzny testified that the only records available were up to June 30, 1966, and if there was a volume increase subsequent to that date, *he* had no record of it. The peculiar significance of this deficiency is illustrated by the following:

1.   Only 154 carloads were shipped from Mansfield during 1965, but 151 cars had been shipped in 1966 during only 199 working days.

2.   The cars of feed received by Williams Feed Company had increased from two in 1964 to three in 1965 and 38 in 1966. Mr. Earl Williams said that their cars received had more than doubled in twelve months.

3.   The revenues assigned to the station had increased from $5,470.40 in 1964 to $11,622.86 in 1965 and for the twelve months ending June 30, 1966, amounted to $14,544.59.

4.   A proposed cattle feed lot for which a site adjacent to the railroad had been purchased would ship and receive cattle and feed.

If the General Assembly had intended that the financial loss be determined for the preceding fiscal year or the preceding calendar year rather than the preceding twelve-month period, it would have clearly said so rather than using the language it did.

There was no testimony to show that the method used by appellant to determine gain or loss in this instance was according to standard accounting procedures required by Act 203 of 1961. Mr. Hyzny testified only that the exhibit offered by him: "[I]s the standard procedure that we have used many times in presenting our exhibits on station closings in the state of Arkansas." This testimony falls far short of establishing these approaches or methods as "standard accounting procedures." This witness also admitted that the indirect cost percentage was not correct insofar as the station proper at Mansfield was concerned. He also said that under this system, the revenue assigned to Mansfield would have to be around $90,000.00 in order to show a profit.

Appellant also challenges the finding of the Commission that operating economies consistent with the public interest would not result from the closing of the station. It is admitted that the only economy would be the elimination of the direct cost of the station operation. The Commission made specific findings: that the closest agency stations would be at Howe, Oklahoma, a distance of 29 miles, and Booneville, Arkansas, a distance of 25 miles; that patrons who receive shipments would be required to post bond for expeditious unloading of cars delivered to Mansfield pending payment and surrender of bills of lading; that passengers on trains would have to pay fares to conductors on the trains rather than purchase tickets from the station agent; that the operators of the proposed cattle feed lot would be seriously hampered. Evidence adduced by appellant substantiated the first three findings. There was testimony on behalf of the protestants tending to substan-

tiate the fourth finding. Testimony of appellant's witnesses also shows that the two passenger trains stopping at Mansfield (both at night) will be continued; that as long as passengers boarded the train at the station at night, the railroad needed someone there to see that passengers boarding the trains are not bothered; that freight shippers would have to call long distance (at the expense of the railroad) to Booneville for bills of lading, but the bills would be forwarded to the agent by mail, executed by him and returned to the shipper by mail; that railway express would no longer be handled through the railroad station; that passengers on interlined tickets would have to call the agent at Booneville and pick up their tickets, or have them mailed to them if there was time, board the trains at either Howe or Booneville, or purchase tickets at the stations in Little Rock or Memphis; that a lumber company in Mansfield had not been solicited for freight; that commencing in the month of April 1965 there was an increase in carload shipments due to the commencement of shipment of wood chips; that there had been an increase in business over the period of 15 to 18 months that the station agent's work hours had been at night instead of day.

On behalf of protestants, it was further shown: that there was no rail service between Mansfield and Fort Smith, 30 highway miles away; that Mansfield was totally dependent upon the Rock Island for rail service; that Williams Feed Company had increased the number of freight cars delivered to it from 2 to 38 from 1964 to 1966; and that a chamber of commerce had been recently organized for the purpose of inducing industry to come to the Mansfield area.

While there is no doubt that the railroad would effect operating economies by closing the station, we cannot say that the Commission's findings that these economies would not be consistent with public convenience and necessity in keeping with § 73-809 are clearly against the preponderance of the evidence.

It is notable that the indirect operating costs allocated to the Mansfield system would continue and supposedly be allocated to the remaining stations. While appellant argues that the effect of this particular closing on the ratio to be applied to these other stations would be insignificant, it is possible that shifts resulting from a station closing such as this could produce a chain reaction having a "falling domino" effect on station closings. Thus, the importance of the legislative requirement that public convenience and necessity be considered in these matters is emphasized.

The judgment is affirmed.