## CITY OF CARAWAY v. ARKANSAS COMMERCE COMM'N ET AL

5-5251                                                      453 S. W. 2d 722

Opinion delivered May 18, 1970

*Carpenter, Finch & McArthur,* for appellant.

*Moses, McClellan, Arnold, Owen & McDermott,* for appellees.

J. FRED JONES, Justice. This is an appeal by a number of citizens of the City of Caraway, Arkansas, from a judgment of the Pulaski County Circuit Court reversing the findings and order of the Arkansas Commerce Commission and directing the Commission to issue an order granting the railroad the authority to discontinue its agency station at Caraway, Arkansas. The original petitioners have appealed under the style of City of Caraway, and the Arkansas Commerce Commission has joined in the notice of appeal and designation of record. The appellant relies on the following point for reversal:

"The judgment of the Pulaski Court in reversing the Arkansas Commerce Commission's order is contrary to the law, contrary to the evidence and contrary to the law and evidence in finding that the station should be closed at Caraway, Arkansas."

The facts appear as follows: On March 20, 1968, the appellee railroad company filed notice with the Arkansas Commerce Commission of its intention to discontinue its agency station at Caraway, Arkansas, such discontinuance to become effective June 24, 1968.

The notice was filed under authority of Ark. Stat. Ann. § 73-809 b (Supp. 1969), which reads as follows:

"Any railroad operating in this State may file with the Arkansas Commerce Commission a notice of discontinuance, dualization or modification of any of its agency stations together with a statement certified by a proper officer of the railroad to the effect that such agency station had been operating at a financial loss according to standard accounting procedures for not less than one [1] year immediately preceding, or that operating economies would result consistent with public convenience and necessity; and such agency station may thereupon be closed or modified ninety [90] days after date of filing of such notice unless a petition for the re-establishment of such discontinued, dualized or modified agency station, signed by at least twenty-five [25] qualified electors residing in the city, town or political subdivision where the same is located, is filed with the Arkansas Commerce Commission within sixty [60] days after date of filing of the notice aforesaid. The Arkansas Commerce Commission is authorized, empowered and required to hear and consider all petitions for the re-establishment of any agency station discontinued, dualized or modified by the railroad under authority of this Act [section], which hearing shall be held within sixty [60] days following filing of petition for re-establishment and following thirty [30] days written notice of such hearing to the railroad and petitioners. In determining whether an agency station should be discontinued, dualized or modified, the standard to be employed is whether the railroad has operated the agency station at a financial loss according to standard accounting procedures for not less than one [1] year immediately preceding the filing of the notice of discontinuance, dualization or modification, or whether operating economies would result therefrom."

The question before the Commission was whether or not the agency station at Caraway had been operating at a financial loss, according to standard accounting procedures, for more than one year preceding the filing of the notice of discontinuance, or that operating economies would result, consistent with public convenience and necessity.

The evidence pertaining to the "financial loss according to standard accounting procedures" is not as clear in the record as it might have been, but Mr. Wade Ellis, assistant special accountant for the appellee railroad company, testified that according to standard accounting procedures used by all the railroads and accepted and approved by the Interstate Commerce Commission as well as other agencies, including the Commerce Commission and courts of Arkansas, the railroad company had sustained a loss on the Caraway station for a twelve month period in the amount of $1,585.99.

Considerable testimony was directed to the specific figures of income and expenses chargable to the Caraway station. Mr. Ellis testified that in arriving at whether or not a particular station is operating at a financial gain or loss, under the standard accounting procedure adopted by the railroads and used by the appellee, the revenues chargable to the particular station include 50% of the local business and also 100% of the particular station's proportionate share of the revenues on interline shipments received and forwarded. Mr. Ellis attempted to explain that in the case at bar, local business is defined as business or freight shipments originating at one point on the Cotton Belt and terminating at another point on the Cotton Belt. This means, as we interpret it, that when a carload of freight is shipped from Caraway to another station on the appellee's line, or from another station on the appellee's line to Caraway, 50% of the revenue received for that shipment is allocated to the Caraway station and 50% to the other station on the line from which the shipment originated or at which it terminated.

Mr. Ellis testified that "interline business" means what the phrase implies, *i. e.*, shipments originating at a station on the appellee's line and terminating at a station on some other railroad company's line; or, originating at a station on the line of another carrier and terminating at a station on the appellee's line. As we interpret Mr. Ellis' testimony in this connection, the Caraway station would receive, in addition to the 50% of the local business, 100% of the revenue received by the appellee on shipments originating on some other railroad system and terminating at the Caraway station, and would likewise receive 100% of the revenue received by the appellee for shipments from Caraway to a station on some other railroad system. Mr. Ellis testified that from these two sources for the twelve month period involved, there was $18,417.49 in the railroad revenues assigned to the Caraway station. He says that there was also a total of $107.58 in miscellaneous revenues credited to the Caraway station for the same period.

It thus appears that the standard accounting procedure used for the allocation of the revenues or *income* between the stations is a fairly simple one. The difficulty arises in the allocation of the railroad *expenses* between the stations in arriving at the profit or loss to be credited or charged to a particular station, and it is in this area that the accounting procedure is questioned. According to Mr. Ellis the *cost* item, in arriving at financial profit or loss, is figured on two bases. One is the cost of handling *exclusive of station operations,* and the other is the actual cost of station operations. Mr. Ellis' testimony is not perfectly clear on this point, but it appears that the company's cost of handling *exclusive of station operations,* includes such items as the cost of locomotive and rolling stock maintenance and operation, as well as such items as roadbed and track maintenance. He testified that under the standard accounting procedures used by the appellee railroad, the amount of this cost to be charged to a given station is determined by the use of a so-called transportation ratio which is 60.42%. According to Mr.

Ellis the transportation ratio of 60.42% is simply the ratio of the operating expenses, exclusive of expenses peculiar to the individual stations such as utilities and station agent and employee wages, to the revenue received over the entire transportation system.

Mr. Ellis says that under the accepted standard accounting procedures, in order to ascertain the profit or loss chargeable to a single given station, the total earnings for that station ($18,525.07 in the case at bar) are multiplied by the transportation ratio to obtain the amount chargeable to that station as its proportionate share of the operating cost *exclusive of station operations.* ($11,192.83 in the case at bar). Mr. Ellis testified that in determining the *entire* expenses chargeable to a given station, the cost of handling, *exclusive of station operations,* is simply added to the cost of station operations. According to Mr. Ellis' testimony the total cost of operating the Caraway station, including *actual* cost of the Caraway station operations in the amount of $8,918.23, and including Caraway's portion of the cost of handling exclusive of station operations in the amount of $11,192.83, and as ascertained through use of the transportation ratio as above set out, amounts to $20,111.06, and results in a net loss of $1,585.99 over the twelve month period of time involved.

The question of whether the method accounting used by the appellee railroad company, in this case, is the best and most accurate method available for fairly and accurately determining the amount of profit or loss attributable to a given station on a railroad transportation system, was not the question before the Commerce Commission at its hearing in this case, and is not the question before us in this appeal. There is considerable competent evidence in the record before us, that the accounting procedures used by the appellee railroad company, and the financial loss shown thereby, were arrived at "according to standard accounting procedures" as required by the statute, and there is no evidence at all in this record to the contrary.

Commissioner Harkey apparently devised his own,

and to him a more simplified accounting method, through which he concluded that the Caraway station had shown a profit of $7,971.36 rather than a loss of $1,585.99 as testified to by Mr. Ellis. Mr. Harkey explains the manner in which he arrived at his results in the following words:

"I arrived at it by taking the figures on Proponent's Exhibit No. 5, Column 1, the total system railway operating revenues freight service, and dividing that into column No. 3, the total system station expenses, which gives me a ratio of 3.45% and I then took that 3.45 percentile and multiplied it times the amount in column 1 of Proponent's Exhibit No. 1 which gave me a figure of $639.12 to go in column 7, Proponent's Exhibit No. 1, which added gives a figure of $10,553.71 and subtracted from the figure in column 5, Proponent's Exhibit No. 1 gives a net profit of $7,971.36 for the station at Caraway."

We had difficulty in following Mr. Ellis' testimony, but we find it difficult indeed to follow and understand Mr. Harkey's. How Mr. Harkey arrived at his 3.45% ratio he makes fairly clear. This ratio represents the percentage of profit over loss throughout appellee's entire railroad system. Mr. Harkey says that he then multiplied that ratio times the amount in column 1 of proponent's exhibit No. 1 and obtains a figure of $639.12, which he considers at cost of station operations chargable to the Caraway station. Column 1, in proponent's exhibit 1, contains a list of the particular months involved and the total earnings of $18,525.07 for the Caraway station, as shown in column 5 of exhibit 1, is the only column in exhibit 1 which gives the $639.12 figure obtained by Mr. Harkey when multiplied by 3.45%

So apparently Mr. Harkey multiplied the percentage of income over appellee's entire system by the total earnings credited by the Caraway station and obtained the amount of $639.12 as the cost of station operations.

chargable to the Caraway station. He apparently then added this cost of station operations to the cost of handling, exclusive of station operations, and arrived at a figure of $10,553.71 apparently as the total cost of station operations. He apparently then subtracted this $10,553.71, the total cost of station operations, from $18,525.07, total earnings for the Caraway station, and thereby arrived at a net profit for the Caraway station of $7,971.36.

Commissioner Panich apparently also arrived at the conclusion that the appellee railroad had operated its Caraway station at a financial profit of $400 more or less than the $7,971.36 found by Mr. Harkey, but Mr. Panich did not attempt to explain the accounting procedures he used in arriving at his conclusion. Mr. Harkey and Mr. Panich did not derive their methods of accounting from the evidence before them and there is no evidence at all that the accounting procedures they did use were standard accounting procedures as required by the statute. Apparently Commissioners Harkey and Panich used their own separate and private accounting procedures in arriving at their conclusion. All we know of the procedure used by Mr. Panich is stated by him as follows:

"Well I don't know, of course, how Mr. Harkey arrived at his figure of $7,971.00 but I do know how I arrived at my figure and we are not but $400.00 apart and we are not accountants but we have calculated within a few hundred dollars by entirely different systems of calculation but we have come to approximately the same figure of profit for that station up there."

Of course, neither Mr. Harkey nor Mr. Panich were witnesses in this case but they were two of the three members of the Commerce Commission who were charged with the duties and responsibility of hearing testimony from sworn witnesses, and were charged with the responsibility of applying the law to the facts as

presented in this case. We do not say that the Commerce Commission does not have the authority to set up and establish a *standard* accounting procedure for the determination of whether a railroad has operated a given agency station at a financial loss or profit during a given period of time, but we do say that this has not been done. The members of the Commerce Commission have no more authority than the railroad companies have, to employ "entirely different systems of calculation" or such system of accounting procedures as to the member or company may seem right, just and convenient in connection with a petition for establishment or discontinuance of railroad service. This was the exact point we had before us in the case of *CRI&P R. R. Co.* v. *Ark. Commerce Comm.*, 243 Ark. 661, 420 S. W. 2d 917. In that case there was no evidence that the accounting procedures used were *standard accounting procedures* and we, like the Commissioners in the case at bar, had no authority to adopt our own nonstandard accounting procedures in determining profit or loss in the operation of a given station. We felt compelled in that case to affirm the judgment of the trial court which affirmed the action of the Commerce Commission in denying the authority to discontinue the operation of the station at Mansfield, and in that case we said:

> "Appellant's case as to financial loss must fail for two reasons. First, there is no evidence to show whether there was financial loss for one year immediately preceding the notice of discontinuance, *i. e.,* from September 27, 1965, to September 26, 1966. Secondly, there is nothing to show that the accounting procedures used in this case are 'standard accounting procedures' in the sense of the Act."

In the later case of *Ark. Commerce Comm.* v. *K C S Ry. Co.*, 244 Ark. 912, 428 S. W. 2d 83, the Commerce Commission denied the Kansas City Southern Railway Company authority to close its station located at Winthrop in Little River County, and the circuit court reversed the Commission. On appeal to

this court, the issues were almost identical to those in the case at bar. The appellant contended for reversal that the trial court erred in finding that the station was operated at a loss for one year, and that the trial court erred in finding that operating economies would result to the appellee consistent with public convenience and public necessity if the station was closed. As to the first point, this court said:

"The decisive issue here is whether appellee showed, by 'standard accounting procedures,' that the station operated at a loss (as required by the statute).

It is undisputed that the exhibits introduced by appellee before the Commission showed the station did operate at a loss for the required time. The only question then is, was the showing arrived at 'according to standard accounting procedures'? This was one of the decisive issues in the case of *CRI&P RLD. Co.* v. *Ark. Commerce Comm.*, 243 Ark. 661, 420 S. W. 2d 917. There the Commission and the trial court held against appellant because no such showing was made. There we said: 'There was no testimony to show that the method used by appellant . . . was according to standard accounting procedures required' . . . by the statute. That is not the situation in the case here under consideration, as is shown by the undisputed testimony of appellee's witness, Mr. Johnson.

Q. Is this allocation of 50% to origin and destination stations standard railway accounting procedure?

A. Yes, sir, it is.

Q. Is the allocation of system expenses which you have described in Exhibits No. 1 and No. 2 standard railway accounting procedure?

A.   Yes, sir.

No evidence was offered by appellant to contradict Johnson's testimony, and none to show he was not competent and qualified to testify.''

It is obvious that the railroad companies have attempted to work out an accounting procedure for the determination and allocation of profit and loss to a specific station as related to the entire system of the particular railroad, on a basis whereby each individual station is charged and credited with the actual profit and loss peculiar to that particular station; and at the same time, is required to bear its own proportionate share of the expenses or cost incident to the entire system, such as the maintenance of the rolling stock and the track facilities between stations. The standard accounting procedures used by the appellee railroad company in this case must be accepted by the Commission and this court as being in compliance with the statute so long as the accounting procedure is standard and until some better procedure is devised and standardized.

As to the operating economies consistent with public convenience and necessity in the case at bar, the record reveals that the car shipments from and to Caraway for the period under consideration, amounted to 98 cars and that only eight individual shippers were involved. Eight individuals or corporations received 59 cars and four individuals made shipments out of Caraway during this one year period. By far the largest shipment of commodities received at the Caraway station, was tank carloads of Thermo gas used for domestic home heating and cooking purposes. By far the greatest number of carload shipments from Caraway consisted of wheat during the month of June. The wheat shipment in June involved 42 cars out of the total of 98 cars for the year. It was shown by the evidence that, although Caraway is in a prime cotton producing area, cotton is no longer shipped over the spur railroad from Caraway, but is shipped by motor

truck directly from the gins at Caraway to the compresses on the main line at Blytheville. The record further reveals that by far the largest shipper, as well as receiver of the appellee's railroad service at the Caraway station, is the Degelow Cooperative located approximately three miles from Caraway.

It is apparent from the testimony adduced that practically all business conducted at the Caraway station between the appellee and its customers is carried on by telephone. The usual procedure followed in obtaining cars and checking on shipments to and from the Caraway station, is that an interested customer calls the local agent at Caraway, who in turn calls the agent on the main line at Blytheville, who in turn obtains the information from the proper source and transmits it back by telephone to the agent at Caraway, who in turn transmits it to the interested person. The uncontradicted testimony indicates that the station agent at Caraway is required on the average, to spend approximately 45 minutes of his eight hour workday in the business of the appellee in connection with transportation of commodities in and out of the Caraway station.

The judgment of the circuit court is affirmed.